---
Drury v. The State.
---

## GEORGE D. DRURY v. THE STATE.

Where the facts show with reasonable certainty that the prisoner is guilty of murder with express malice it is not error to refuse bail.

The judge below is in a far better situation than this court to determine as to the credibility of the witnesses, in case of conflict or apparent contradiction; and, therefore, generally, great deference must be paid to the construction placed upon it by him, as disclosed in the judgment he has rendered.

See the case of McCoy v. The State, *ante* p. 33, for the legal principles applicable to this case.

APPEAL from Fort Bend upon a writ of *habeas corpus* granted and tried before the Hon. George W. Smith, in vacation.

Application for bail after indictment found against the applicant, George D. Drury, for the murder of Ambrose R. Pitts, on the 2d day of January, 1860.

Drury and Pitts were in partnership in the blacksmith business, the former living at the house of the deceased. They commenced making a settlement of their partnership business on the day previous to the killing, apparently with the view of a dissolution of partnership. A few days previously Drury had expressed his intention to go to the city of Houston.

About one month and a half before the killing, Drury, in a conversation in relation to a difficulty which had taken place between Pitts and one Roberts, remarked Pitts was a brave and a dangerous man; and if he were to have a difficulty with him, he would shoot him down like a bear. Pitts was then absent from the State, and the witness regarded the remark as a mere idle expression.

Another witness testified that he had had frequent conversations with Drury in relation to his business with Pitts, in one of which, about two months before the death, he said he feared to have a settlement with the deceased; was afraid they would have a difficulty; and that he preferred postponing the settlement until after the first day of January; that then he thought they could divide the accounts without trouble. And again, in another con-

versation, on the day previous to the killing, he said he feared. they would have a serious difficulty in relation to the settlement of their business. The settlement had then commenced. The shop belonged to Pitts, and the land on which it was situated belonged to Drury, and to whom a part of the tools also belonged. Drury remarked also to the witness, that he would rather put up another shop than pay Pitts the price he asked for his; that he could do it at less cost.

The settlement progressed between them at night of the day on which it commenced.

Chancey Hall testified that he slept in the room in which they were engaged in settling accounts; Drury calling them over and Pitts setting them down. They were thus engaged, laughing, and apparently in perfect good humor until two o'clock, when the witness, (who had retired at about nine o'clock, and had awakened occasionally in the interval, and heard them still engaged, and in good humor,) went to sleep and awoke no more until the catastrophe. They continued with the settlement until nearly day-light, when, according to the testimony of Mrs. Pitts, the widow of the deceased, they finished the settlement of the accounts, without any dispute so far as she heard. She slept in an adjoining room, separated by a thin plank partition. She testified that after the settlement of the accounts they walked out on the gallery; heard the deceased say to Drury, that "he had made every proposition about the shop that a man could make, and if he did not choose to accept them, to let it alone, as he wished to go to work in it that day." Drury replied, that "he (Pitts) should not work in it, that he would stop him." The deceased rejoined, that "he had a perfect right to work in it; that the shop and all that was in it belonged to him." Drury then said, "I may be a better man than you take me to be." Pitts replied, "you may be—and you may be deceived in me." Drury then said, "it is now morning, go over and go to work." To which the witness heard no answer. Pitts went into the house and sat down; and Drury, after remaining on the gallery a few minutes, walked in and renewed the conversation about the shop. Pitts replied, that "it is not worth while for us to have any words about it; I have

made you every proposition that a man could make another, and if you don't see fit to take it, let it alone." That Pitts came to her for the keys of the store, which was but a short distance thence, for a shop book which was in the store; that Drury sat in the room about long enough for the deceased to walk to the store, and then walked out on the gallery. About two or three minutes afterwards a pistol was fired, she ran out and saw the prisoner running from the deceased; saw him pass through the gate. The witness went immediately to the deceased; he never spoke, but was breathing his last. Within a few seconds J. Y. Cavin also came, and with two negro women carried the deceased to the house; and there, in the language of the witness, "we took his coat and vest off; I found a Bowie knife under his vest. The scabbard was in his pants behind, and the handle of his knife was up under his arm; the knife was in the scabbard, in no wise drawn. He had no other weapons about him, and I found no weapons where he was shot—nothing but the book which he had gone after."

Dr. Baines testified, that he had heard Mrs. Pitts say that she took the knife from the body of the deceased, after he was shot, being assisted by J. Y. Cavin and a negro girl; and that there was a bruised place on the breast of the deceased, about two inches to the left of the bullet-hole, which appeared as if made by the muzzle of a pistol; and that the metal piece off the end of the knife-scabbard was found in the right leg of the pantaloons.

Mrs. A. L. Cavin testified, that she ran out of a house near by, immediately after the firing of the pistol, to where the body was lying. That when the body was carried into the house, she saw Mrs. Pitts immediately run her hand into the left breast of the deceased, around under the vest, and remarked, "that Mr. Pitts had nothing; that she had taken the knife away from him before the shooting occurred; that Drury had shot him whilst he had nothing, and had run like a dog." The witness also stated, that when J. Y. Cavin told Mrs. Pitts (on the occasion of the killing) "not to say that Drury had killed Pitts, unless she knew it," Mrs. Pitts remarked, that she knew he did it, for the servant girl (naming her) told her that she saw Drury on the gallery a few

moments before. Mrs. Pitts, on her examination, was asked if she had not made the remarks imputed to her by Mrs. Cavin in the presence of the latter and of J. Y. Cavin, which she denied having made.

J. C. Simonton, one of the jury of inquest, testified, that the deceased was killed by a bullet entering his breast, and passing through under his right shoulder. About two inches below the bullet-hole was a bruised spot, about the size of a twenty-five cent piece, which seemed to have been caused by a thrust with the pistol. There were signs of powder-burn on his shirt and face. In his pants was found the metal point of the scabbard of the knife.

It was proved that the morning was a bright star-light. The book referred to by Mrs. Pitts was found near the deceased on the ground.

J. Y. Cavin testified, that he was in the store when the deceased came in, in search of the blacksmith book for 1858; he laughed as he entered, remarking that he had some difficulty in getting in, finding his (witness') key in the door. The report of the pistol was heard within a few seconds after the deceased left the store. He did not see Mrs. Pitts take the knife from the body; does not remember hearing Mrs. Pitts say that she saw Drury run off, and had no conversation with her about the affair. The deceased fell about twenty-five or thirty steps from the store door. Mrs. Pitts never said anything to him about the knife; saw no knife picked up where the body was; there was no candle there when Mrs. Pitts and the servants were there; witness went foremost with the candle, but found nothing but the book; Mrs. Pitts never gave him any reason [for believing] that Pitts was killed by Drury. The witness went out with the candle about ten or fifteen minutes after the body was brought into the house.

The prisoner fled; and on the evening of the day of the killing, on information received that he was seen going from the timber of the Brazos bottom, was pursued by a party of men on horseback, two of whom were armed. When they came in sight, he ran until much exhausted. They demanded of him to surrender, and give up his arms, which he refused to do. After

remonstrating with him, and a threat from one of the party that he would be shot if he did not, he complied, on their assurances of protection and his delivery to the civil authorities. The prisoner then said that he had intended to go to Richmond and give himself up; and that he was forced to shoot the deceased, who, he said, came at him with a drawn knife; and he asked the party if it was not found on the ground near him.

Mrs. Pitts testified, that the deceased put on the knife on the night of the difficulty, after supper; that he was sometimes in the habit of carrying arms; that the prisoner nearly always carried arms; and that Mr. Cavin was holding the head of the deceased when she took off the knife. Pitts was a lame man, and used a wooden leg.

The district judge refused to allow bail to the prisoner, and remanded him to jail. He appealed to the Supreme Court, and assigned as error the refusal aforesaid.

*Attorney-General,* for the appellee.

*Palmer & Richardson,* also for the appellee.—The sole question presented by the record seems to us to be, whether he has been guilty of murder in the first degree, or murder in the second degree.

It cannot be pretended for a moment that the homicide was excused or justified by the circumstances attending it; nor do we suppose that his counsel will insist that it was negligent homicide or manslaughter.

We shall, therefore, confine ourselves strictly to the inquiry as to whether it is murder in the first or second degree—that is, as to whether the act was committed with express malice or not.

The statutory definition of murder, dividing it into two degrees, does not change the common law definition of murder, nor does it change the common law rules of evidence by which murder is proven. It only regulates the punishment according to the degree of atrocity or the circumstances of extenuation of each particular case. (Wharton's Criminal Law, 428; State v. Spencer, 1 Zabriskie R., 196; Virginia Criminal Cases, 390.)

4Y

Express malice is the same under the statute it was at common law, and is defined to be where one person kills another with a sedate, deliberate mind and formed design; such formed design being evidenced by external circumstances, discovering the inward intention—as lying in wait, antecedent menaces, &c. (1 Russel on Crimes, 482; Jordan v. The State, 10 Tex.; Commonwealth v. Green, 1 Ashmead, 298.)

Express malice and implied malice have certain and well defined meanings at law, and apply each to a distinct class of cases; each term is intended to define the particular state of mind or intent with which the act is committed. And by this intent, as evidenced by the circumstances of each particular case, the grade of the offence is fixed. (Wharton Cr. Law, 417 to 436; Virginia Cases, 87.)

If the evidence shows that the act was done with deliberation and a fixed determination to take life, *express malice* is inferred, presumed, deduced, (*implied* we may even say) or, in other words, considered as proven. The facts and circumstances are proven, and from them the intent is ascertained or drawn.

The intent may be proven by the words and acts of the parties, or by acts without words, and, we apprehend, by acts contradicted by words. See Wharton, 232, 268, 319, 322, *et seq.*

Express malice will be inferred from lying in wait. It will be inferred not only from a man concealing himself in the path of his victim for the purpose of killing him, but from the deliberately and premeditatedly seeking an occasion to effect the deadly purpose. (Virginia Criminal Cases, 488–9; 1 Russel, 482, note; Wharton, 361, 419.)

It will be inferred from any other facts showing a deliberate and premeditated intention to take life. (Wharton's Am. Cr. Law, 419, 361, 430, 433; Virginia Cr. Cases, 86, note 488; 1 Meigs R., 265; 6 Rand., 722; Gehrke v. The State, 13 Tex., 574; Addison R., 257.)

Express malice is shown by a clear, deliberate and premeditated design to take life, and killing by the use of a deadly weapon shows such intent. (Wharton, 368 to 428, 432; 1 Russ. on Cr., 483, 482, note; State v. Spencer, 1 Zabriskie R., 196; Penal

Code, Art. 52, 613; 4 Mass., 396; 17 Ala., 601; Commonwealth v. Green, 1 Ashmead, 289; 2 Ib., 41; see particularly White-ford v. Commonwealth, 6 Rand., 722 to 724.)

The rule of law is that a man shall be taken to intend that which he does, or which is the immediate consequence of his act. A mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon very slight provocation, is *prima facie* willful, deliberate and premeditated killing, and throws upon the prisoner the necessity of proving extenuating circumstances. (1 Russ. on Crimes, 483; Hill's case, 2 Grattan, 594; State v. Smith, 2 Strobb, 77; Jordan v. The State, 10 Tex., 479; Wharton, 430; 6 Rand., 724.)

If the design and determination to kill was distinctly formed in the mind at any moment before or at the time the pistol was fired, it will be held deliberate and premeditated killing, and therefore murder in the first degree. (Wharton's Criminal Law, 428–434; Atkinson v. The State, 20 Tex., 531; Jordan v. The State, 10 Tex., 479; 6 Rand., 722–724.)

As to whether the circumstances of alleviation must be shown by defendant to rebut express malice. (See Green v. State, 28 Miss., 688; McDaniel v. State, 8 S. & M., 417; Commonwealth v. York, 9 Met., 93; 1 Russ. on Cr., 483, note; 1 Zabriskie, 196.)

The facts reducing homicide to murder in the second degree, are proof of sudden passion by reasonable provocation, or showing constructive murder, in such cases as are stated in the English law books, and which were there followed by capital punishment; as if a man shooting at a tame fowl, with intent to steal it, kills a person; if a third person or an officer is killed in endeavoring to part two persons who are fighting; if a person throws a large stone or timber from a house in the street where he knows persons are passing, and kills another; so riding a dangerous horse, apt to strike, and happening to kill a person.

In all these it was murder in England, and punishable by death; but in Virginia and Pennsylvania, where there is a distinction similar to our own, they are held murder in the second

Drury v. The State.

degree. (Virginia Crim. Cases, 87; Smith's trial, 89, 90; 1 Ashmead, 298; Wharton's Cr. Law, 417 to 436, and 367, 368; Addison R., 257–283.)

See case of a man pointing a pistol at a person on horseback, declaring at the time that he only did so to cause the horse to throw him, but strikes a third party and kills him. (1 Russ., 483, note; State v. Smith, 2 Strobb, 77.)

The evidence in this case establishes both the killing and the deliberate, premeditated intent to kill, beyond any reasonable doubt, either as to the intent or the commission of the act itself.

If the record discloses any evidence rebutting the presumption of express malice raised by the foregoing facts, we have been unable to discover it.

It may probably be contended that there is a reasonable doubt as to whether the act was committed in a heat of passion, from previous provocation, or under the belief of impending danger.

But the State has shown the killing clearly, and under circumstances showing deliberate intention to kill, and if the prisoner has committed the rash act at such time and place as to render it impossible for him to show any extenuating circumstances, it is his own misfortune, and this court will not, after he has fled, and thereby increased the probability of his guilty intent, undertake to give him the benefit of a simple doubt thus raised upon a question of bail. (See State v. Rockafellow, 1 Halsted, 343–4; Wharton's Cr. Law, 269; Hill's Case, 2 Grattan, 599.)

ROBERTS, J.—As to the credibility of the witnesses, in case of conflict or apparent contradiction, we think the judge below in far better situation to determine than this court, and therefore, generally, great deference must be paid to the construction placed upon it by him, as discovered in the judgment he has pronounced.

Thus regarding the facts, then, as presented in this case, we are of opinion that they show, with reasonable certainty, that the prisoner has been guilty of murder with express malice, and that therefore we cannot say that the judge erred in refusing bail.

The legal principles applicable to this case are developed in the case of McCoy v. The State, just decided.

Judgment affirmed.