## EX PARTE R. J. AND W. B. MOORE.

1. HABEAS CORPUS.—PRACTICE IN THIS COURT.—Although the adjudication of facts by the court *a quo* is not binding on this court in any state of case, yet, in cases of conflicting testimony, the judge of that court stood in a much better situation than this court can, to determine correctly the comparative credibility of the witnesses; and, therefore, great deference is usually to be accorded to the construction he has placed upon the testimony.

2. SAME.—This court maintains its practice of abstaining from comment upon the evidence in *habeas corpus* cases.

HABEAS CORPUS, on appeal from a judgment in chambers, rendered by the Hon. L. W. MOORE, judge of the Fifteenth Judicial District.

I. G. Killough, a citizen of Fayette County, held in the highest esteem for his personal integrity, his public spirit and usefulness, his private charities, and an intrepidity of soul often tested, but never shaken, in the military service of

Texas, came to a sudden and sanguinary death on October 2, 1878. He resided in the town of La Grange, and in the afternoon of the day of his death was returning home from his farm, a few miles in the country, accompanied in his buggy by his wife and their little four-year-old boy, when he was fired upon and instantly killed.

The appellants in this case were arrested and held in custody on the charge of the murder of Capt. Killough. One of them, Robert J. Moore, is the brother of Mrs. Killough; the other, William B. Moore, is her nephew. John D. Hunt, principally inculpated by the testimony, but not arrested, is her brother-in-law.

The testimony of more than forty witnesses was adduced, much of which relates to localities, motives, and incidents of a circumstantial bearing upon the case, and the whole of which constitutes quite a voluminous record. A synopsis is deemed sufficient for the purposes of this report.

Mrs. T. B. Killough, wife of the deceased, testifying for the State, says in substance that on the day of the killing, her husband, herself, and their child were returning to La Grange from the farm of the deceased, in a buggy, and that they were intercepted between Phillips's house and Jordan's Creek by the appellants and one John D. Hunt; that Hunt levelled his shot-gun and shot the deceased, who fell out of the buggy over witness and their little boy, both of whom fell out with deceased, the child falling under the body of its father. The witness pulled the child from under the body of its father, and ran up and down the road to see if she could see any one passing, to whom she could appeal for help. She saw no one. There was not a living being to witness the murder except herself, child, and the two Moores. The Moores and Hunt came out of the woods from the right, across the road, abreast, and all in the same position. The Moores stopped their horses in front of the buggy, some fifteen or twenty feet distant, with the horses'

heads turned a little across the road. When the Moores stopped in the road, Hunt drew his gun. After firing, Hunt rode around the buggy and stopped near the body of the deceased, and asked witness, "What did you let him do that for?" Witness replied, "Do what, you assassin?" to which Hunt replied, "Try to kill me; did you not see him?" Witness answered, "You assassin! you know he did not try to shoot you!" Hunt then rode off toward Ledbetter. Deceased was driving the buggy, and was killed without a word having passed. He had no weapon of any kind, either about his person or about the buggy. After Hunt left, Bob Moore pulled out a derringer, shot it off, and threw it down by deceased's back. Witness picked it up, and Bob Moore remarked, "That is what he tried to shoot Hunt with." Witness replied that her husband had told her he (accused) could do that, and now "you are doing that very thing, and I am here seeing you do it." Deceased's friends had previously disarmed him, and he had no pistol. Deceased never owned a pistol like the one thrown down by his body, to witness's knowledge. After some time had elapsed, one Jones drove up in a wagon. Witness asked Jones to stay with the deceased's body until she could go for friends. Jones declined, saying he was in the employ of Col. John H. Moore, and could not stay. Witness then asked her brother and nephew if they would stay, the nephew declining and the brother agreeing to do what he could for her, but witness declined receiving anything at his hands. Bob Moore took Jones off and talked to him, and was talking to him when witness went on to town. The two Moores each had a double-barrelled shotgun in hand during the whole of these occurrences. Bob Moore is witness's brother, W. B. Moore her nephew, and Hunt her brother-in-law. Witness and her husband were travelling an unusual road for them, to avoid meeting Hunt, under advice of friends.

James Kenley, sworn, says that himself and W. B. Moore work at Col. Moore's gin, and that on the day of the killing Bob Moore and Hunt rode up to the gin. In a few minutes Bob and W. B. Moore and Hunt rode off together, each carrying a double-barrelled shot-gun ; and after a sufficient length of time to have ridden five miles, W. B. Moore came back, riding his horse in a run, and said to witness that the " son of a b—h had quit whipping the Moores and Hunts ;" and on witness asking his meaning he said, " Uncle John Hunt has killed Killough." W. B. Moore did not have the gun on his return, but had a six-shooter. Witness went to the body, and found many others there. It was lying in the road. Major Dunn and witness examined deceased's pockets and found no weapons of any kind, except a pocket-knife. About one hour had elapsed from the departure of the two Moores and Hunt up to the return of W. B. Moore. Witness found the body of deceased lying about three-fourths of a mile from the gin. Never heard that Byrd Moore had made arrangements to go hunting.

The testimony of C. Amberg is, substantially, that Hunt came to his store, in Ruttersville, on the Monday preceding the murder, and bought 25 cents' worth of percussion caps and buckshot. Hunt stated to witness that he had had a difficulty with the deceased in La Grange, in which deceased used a cane on him, and that he didn't know how he could stand it. Hunt had a double-barrelled shot-gun with him at the time.

Max Scheich testified, in effect, that he is a blacksmith in Ruttersville ; that Bob Moore came to his shop on Monday, before the killing, and got him to take the tubes out of his shot-gun and make an examination. Hunt came up after Moore, and the two left together.

Two witnesses relate, in substance, that after the difficulty between deceased and Hunt in La Grange, witnesses and one other, attempting to settle the difficulty, went, with

deceased's permission, to Hunt's house, and submitted an agreement signed by deceased, pledging himself to refrain from hostile demonstrations on Hunt, provided Hunt made none on him. This was submitted, after stating to Hunt that deceased had said that if Hunt had not intended to insult him, he, deceased, was sorry he had struck him, and begged his pardon. This was rejected as a basis of settlement. Witnesses then proposed that each party, deceased and Hunt, should select three friends each, and abide by whatever agreement they should make. Hunt submitted this proposition to R. J. Moore, and it was finally declined, with the remark that deceased had broken two previous pledges, and would break a third. It was finally agreed that the parties should pass and repass without molesting each other for one week, and the deceased was to go unarmed. This was on Monday preceding the Wednesday of the killing. It appears from this testimony that there had been a previous difficulty between deceased and William Moore, the father of W. B. Moore and brother of R. J. Moore, in regard to which an armistice was now operating. W. B. Moore was not known to witnesses in any of these transactions.

Mrs. Elizabeth Moore, wife of R. J. Moore, for the defence, testified, in substance, that on Wednesday, the day of the killing, Hunt took dinner with herself, husband, and other members of the family, at Col. J. H. Moore's, preparatory to going hunting that evening with her husband; that she prepared food to do them that night and next morning; that they left the house, starting, according to their own statements, to the old farm of Col. J. H. Moore, some ten miles distant; that they both carried shot-guns, and said they were going by the gin, after W. B. Moore. Witness did not see W. B. Moore that day until after the killing.

W. R. Wallace, for the defence, describes the pistol iden-

tified as the one Mrs. Killough picked up by the side of deceased, and discovers the initials "I. G. K." on it.

James Jones, for the defence, testified, in substance, that he lived on a place of Col. Moore's, and was on his return from La Grange to his home, near the gin, on the day of the killing; he was passed by the two Moores and Hunt; that about seventy-five yards in front of him, the three parties alluded to met the buggy containing the deceased and his wife and child, the two Moores passing to the right and Hunt to the left of the buggy; that as the parties got abreast, — none of them halting, — he saw the deceased extend his right arm towards Hunt, and saw Hunt level his shot-gun at deceased, and heard two reports, one louder than the other. Witness heard the weaker report first. Deceased fell out on the left side of the buggy instantly, his wife and child falling with him; heard no other report of fire-arms, though he remained on the ground until after the Moores, Hunt, and the wife of the deceased had left; had no private conversation with either of the Moores on the ground at or near the place of killing; is a tenant of Col. J. H. Moore, father of one and uncle of the other defendant.

William Phillips testified, in substance, that he was at work in a cotton-patch near where deceased was killed; heard two reports of fire-arms in the direction of where the body lay, one louder than the other, and about two seconds apart; heard the weaker report first, and heard no other report after the louder one of the two already mentioned.

The testimony of Mrs. Mary E. Phillips and J. W. Phillips is substantially the same.

The presiding judge refused bail for the applicants, and remanded them to custody, to await the action of the grand jury; and from this they took the present appeal.

*Timmons & Brown, Teichmuller & Dunn,* and *W. H. Led-*

*better*, for the appellants, citing Paschal's Digest, arts. 3221, 3222, urge that from the plain requirement of the statute it follows that this court, in its decision on appeals in *habeas corpus* cases, is not bound by the general rule that the finding of facts by the trial court will not be revised unless clearly wrong; but, on the contrary, it is the duty of this court to examine the facts and apply to them the law, just as if the trial here were an original one. See *Ex parte Miller*, 41 Texas 213, and cases there cited; *Ex parte Rothschild*, 2 Texas Ct. App. 560.

Section 11 of the Bill of Rights of the State Constitution, provides as follows, viz. :

" All prisoners shall be bailable by sufficient sureties, unless for capital offences when the proof is evident."

From this clause, it follows that the applicants in this case are entitled to bail, unless it is evident that they are guilty of murder in the first degree.

In determining whether or not it is evident that they are guilty of murder in the first degree, we must first see what is the meaning of the terms " evident " and " proof is evident."

The Constitution of 1845 provides : " All prisoners shall be bailable upon sufficient sureties, except in capital cases when the proof is evident or presumption great."

The meaning of this section, which we find in all the Constitutions of the several States of the Union, is explicitly defined in the case of *McCoy* v. *The State*, 25 Texas, 38. In that case the court say : " The terms ' proof is evident or presumption great' are as evident to the legal mind as any words of explanation could make them, and are intended to indicate the same degree of certainty whether the testimony be direct or circumstantial. The design is to secure the right of bail in all cases, except in those in which the facts might show with reasonable certainty that the prisoner is guilty of a capital offence."

The same clause in our present Constitution (above cited) has never received judicial interpretation, and hence the inquiries arise :

I. What is the effect of the change?

1. The terms " proof is evident" and " presumption great " have each a distinct meaning.

2. The first of these terms indicates a far greater degree of certainty than the second.

3. In the practical application of these terms to any given case, the words " or presumption great," requiring an inferior degree of certainty, exercise controlling power and virtually supersede the effect of the preceding words, " the proof is evident," and render them superfluous. ·

For, if the section of the Constitution under consideration had been changed as follows : " All prisoners shall be entitled to bail, except in capital cases when the presumption of guilt is great," it would not have affected the right to bail of persons accused of capital offences.

4. By the elimination of the term " or presumption great" from the Constitution, its framers manifestly intended to secure the recognition of the right to bail of persons accused of capital offences, by announcing it in plain and unmistakable language.

II. What is the meaning of the terms " evident " and " proof is evident?"

1. While presumption, or inference from one or more known facts to the one fact sought to be established, is only resorted to in the absence of proof, proof, as the result of evidence, is certain, and leaves no room for presumption.

2. Concerning the term " evident," we invite the attention of the court to the following definitions :

Worcester's Dictionary : "*Evident* — clear to the mind, obvious, plain, apparent, manifest, notorious, palpable — as, it is evident that man is mortal."

Crabb on Synonyms, pp. 84 and 85 : " What is evident

is seen forcibly, and leaves no hesitation on the mind ; it is opposed to that which is dubious. * * * A proof is evident ; it requires no discussion ; there is nothing in it that clashes or contradicts. The guilt or innocence of a person is evident when everything serves to strengthen the conclusion.''

Keeping, then, in mind the meaning of the term " proof is evident,'' we may safely say, from the facts of the case,—

(1) That it is evident that Hunt took the life of Killough.

(2) That it is not evident that, in doing so, he was guilty of murder in the first degree. And why not evident? Because, first, the testimony of Mrs. Killough, upon which the prosecution wholly rely to prove the facts denounced by the law as murder in the first degree, is, in all its material points, contradicted by the witness Jones, an eye-witness to the killing, and whose testimony shows that Hunt acted in self-defence. Because, second, her testimony is contradicted by not only the witness Jones, but by all the witnesses for the prosecution and defence who heard the reports of fire-arms at the time of the killing. Because, third, her testimony is contradicted by the condition of the shirt worn by the deceased at the time of the killing. Because, fourth, the initials, " I. G. K.,'' of the deceased, I. G. Killough, are upon the pistol picked up by Mrs. Killough on the ground.

If, then, it is not evident from the testimony in this record that Hunt is guilty of a capital offence, it follows necessarily that the applicants are not, and should be admitted to bail.

But, suppose it should be the conclusion from the proof that Hunt is guilty of murder in the first degree, it by no means follows that the applicants are, and that they should be refused bail. For in that view of the case they could only be guilty, as Hunt would be, of murder in the first degree, when, from the proof, it could be said that it is evident, —

(1) That they were acting as principals with Hunt in the perpetration of the act; or that

(2) They were personally present, knowing Hunt's unlawful intent, and aided and encouraged him in the perpetration of the crime, by words or gestures; or

(3) That, at the time of the commission of the act by Hunt, they endeavored in some way to secure his safety or concealment. Pasc. Dig., arts. 1809–1811.

There is no testimony in the record which brings the applicants within the purview of either one of the foregoing definitions. There is no certainty, beyond a reasonable doubt, such as would control the minds of a jury in a final trial; far less can the proof be regarded as evident, so as to deprive these applicants of bail.

We respectfully submit that the judgment should be reversed, and the applicants admitted to bail.

*George McCormick*, Assistant Attorney-General; *R. H. Phelps*, County Attorney; *Seth Shepard*, and *Duncan & Andrews*, for the State.

WHITE, J.  In view of the conclusion arrived at in this case, following the uniform practice now so well established, we might simply content ourselves with an announcement of the result, without further comment or remark.   Justice to ourselves, and to the gravity and importance of the question involved, would, however, seem to require the further statement that we have not only listened to and pondered well the truly able arguments of counsel representing the applicants and the State, but have read with deepest attention and care each syllable and word contained in the voluminous record before us.

The interest naturally created by a recital and perusal of the facts given in evidence in the trial court has been greatly heightened by the superior skill and marked ability with which they have been handled in the learned discussion of

the nice and subtle questions of constitutional law, and the rules of evidence applicable to and involved in them. Our endeavor has been so to consider, with deliberation, each fact and circumstance in the light of known and established principles that we could, if possible, arrive at a fair, just, legal, and satisfactory deduction from the whole.

It was said in *Drury* v. *The State*, 25 Texas, 45, — and, we think, correctly, — that being also an appeal on *habeas corpus:* "As to the credibility of the witnesses, in case of conflict or apparent contradiction, we think the judge below in far better situation to determine than this court; and therefore, generally, great deference must be paid to the construction placed upon it by him in the judgment he has pronounced." Still, we do not wish to be understood as meaning that the judgment of the court below would be binding upon us, even in its adjudication upon the facts, in any state of case where we might be impressed with reasonable doubts, or could not willingly concur in its correctness. So much in vindication of the action of this court, in its method of adjudicating the questions in this case.

The result of our mature deliberations is, that the district judge did not err in refusing to admit the applicants, R. J. and W. B. Moore, to bail; and, so believing, the judgment below is in all things affirmed.

*Affirmed.*